# EXHIBIT A

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR WARREN COUNTY

| | |
|---|---|
| GARY RAY DOOLEY, | Case No. _____ |
| Plaintiff, | |
| vs. | **ORIGINAL NOTICE** |
| COMPASS GROUP USA, INC., SOUTHEAST SERVICE CORPORATION, RANDY RICE, and BENNIE MONTGOMERY, | |
| Defendants. | |

**TO:  THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE NOTIFIED** that a petition has been filed in the office of the Clerk of this Court naming you as a Defendant in this action. A copy of the Petition (and any documents filed with it) is attached to this notice. The attorney for the Plaintiff is Bruce H. Stoltze, Jr., Stoltze Law Group, PLC, whose address is 300 Walnut Street, Suite 260, Des Moines, Iowa 50309, telephone number (515) 989-8529, facsimile (515) 989-8530 and email: bruce.stoltze.jr@stoltze.law.

You must serve a motion or answer within twenty (20) days after service of this Original Notice upon you and, within a reasonable time thereafter, file your Motion or Answer, with the Clerk of Court for Iowa District Court for Warren County, at the Courthouse in Indianola, Iowa. If you do not, judgment by default will be rendered against you for the relief demanded in the Petition.

This case has been filed in a county that utilizes electronic filing. General rules and information on electronic filing are contained in Iowa Court Rules Chapter 16. Information regarding requirements related to the protection of personal information in court filings is contained in Iowa court Rules Chapter 16, division VI.

If you need assistance to participate in court because of a disability, immediately call the disability coordinator at 515-286-3394. Persons, who are hearing or speech impaired, may call Relay Iowa TTY at 1-800-735-2942. Disability coordinators cannot provide legal advice.

---

**IMPORTANT:**  YOU ARE ADVISED TO SEEK LEGAL ADVICE
AT ONCE TO PROTECT YOUR INTERESTS

E-FILED  2022 OCT 27 3:40 PM WARREN - CLERK OF DISTRICT COURT

# Iowa Judicial Branch

| | |
|---|---|
| *Case No.* | **LACV039493** |
| *County* | **Warren** |

*Case Title*   GARY RAY DOOLEY V. COMPASS GROUP USA, INC., ET AL.

You must file your Appearance and Answer on the Iowa Judicial Branch eFile System, unless the attached Petition and Original Notice contains a hearing date for your appearance, or unless the court has excused you from filing electronically (*see* Iowa Court Rule 16.302).

Register for the eFile System at www.iowacourts.state.ia.us/Efile to file and view documents in your case and to receive notices from the court.

For general rules and information on electronic filing, refer to the Iowa Rules of Electronic Procedure in chapter 16 of the Iowa Court Rules at www.legis.iowa.gov/docs/ACO/CourtRulesChapter/16.pdf.

Court filings are public documents and may contain personal information that should always be kept confidential.  For the rules on protecting personal information, refer to Division VI of chapter 16 of the Iowa Court Rules and to the Iowa Judicial Branch website at www.iowacourts.gov/for-the-public/representing-yourself/protect-personal-information/.

*Scheduled Hearing:*

If you need assistance to participate in court due to a disability, call the disability access coordinator at **(515) 286-3394** . Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). For more information, see www.iowacourts.gov/for-the-public/ada/.  **Disability access coordinators cannot provide legal advice.**

*Date Issued*  **10/27/2022 03:40:07 PM**



*District Clerk of Court or/by Clerk's Designee of* Warren        *County*
**/s/ Lori Morris**

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR WARREN COUNTY

| | |
|---|---|
| GARY RAY DOOLEY, | CIVIL NO. _____ |
| Plaintiff, | |
| vs. | |
| COMPASS GROUP USA, INC., SOUTHEAST SERVICE CORPORATION, RANDY RICE, and BENNIE MONTGOMERY, | PETITION AND JURY DEMAND |
| Defendants. | |

COMES NOW the Plaintiff, Gary Ray Dooley, and for his cause of action against the Defendants Compass Group USA, Inc., Southeast Service Corporation, Randy Rice, and Bennie Montgomery respectfully states:

## INTRODUCTION

1.      At all times pertinent herein the Plaintiff, Gary Ray Dooley (hereinafter referred to as "Dooley"), was and is an individual and resident of the State of Iowa.

2.      At all times pertinent herein the Defendant, Compass Group USA, Inc. (hereinafter referred to as "Compass Group"), was and is a foreign corporation incorporated in the State of Delaware with its home offices in Charlotte, North Carolina, registered in and operating under the laws of the State of Iowa.

3.      At all times pertinent herein the Defendant, Southeast Service Corporation (hereinafter referred to as "SSC"), was and is a foreign corporation incorporated in the State of Tennessee with its home offices in Knoxville, Tennessee, registered in and operating under the laws of the State of Iowa.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

4.    Upon information and belief, Defendant, Randy Rice (hereinafter referred to as "Rice"), was at all times material hereto, a Unit Manager/Campus Services Director for Compass Group and/or SSC and a resident of Iowa.

5.    Upon information and belief, Defendant, Bennie Montgomery (hereinafter referred to as "Montgomery"), was at all times material hereto, the Regional Director of Operations for Compass Group and/or SSC and a resident of Iowa.

6.    Jurisdiction is appropriate because all discriminatory and/or adverse actions, and all acts that form the nexus at issue outlined herein took place in Polk County, Iowa.

7.    The amount in controversy in this matter exceeds the jurisdictional requirement for this Court.

8.    Plaintiff has filed a complaint with the Iowa Civil Rights Commission and received a right-to-sue letter on July 29, 2022.

9.    Plaintiff's Complaint was cross-filed with the U.S. Equal Employment Opportunity Commission, and a Notice of Right-to-Sue was issued on July 6, 2022.

## FACTUAL BACKGROUND

10.    Plaintiff repleads and incorporates Paragraphs 1–9 and Paragraphs 183–602 as if pled here.

11.    Defendant Compass Group provides food and support services to restaurants, corporations, hospitals, schools, arenas, and museums throughout North America.

12.    At all times pertinent herein, Defendant Compass Group owned and operated Defendant SSC.

13.     Defendant SSC provides custodial services, grounds management, and maintenance services at educational facilities around the country.

14.     At all times pertinent herein, Defendant Compass Group and/or Defendant SSC had a contract to perform campus services, including maintenance services, at Simpson College in Indianola, Warren County, Iowa.

15.     In or about October 1988, Plaintiff started working at Simpson College as a Maintenance Tech.

16.     In or about 1990, Plaintiff became Acting Director of Campus Services and then Assistant Director for Campus Services.

17.     Simpson College later outsourced its Campus Services Department to Marriot Campus Services.

18.     After Marriott took over the Campus Services Department at Simpson College, Plaintiff assumed the position of Assistant to the Director/Maintenance Manager.

19.     Marriot Campus Services later became Sodexho Campus Services, and in or about Spring 2017, the District Manager for Sodexho asked Plaintiff to serve as the Acting Campus Services Director.

20.     Plaintiff served as Acting Campus Services Director until on or about June 15, 2019.

21.     At that time, Simpson College had ended its contract with Sodexho and changed its Campus Services provider to Compass Group/SSC.

22.     At the time of Plaintiff's termination, he was employed as a Maintenance Manager.

3

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

23.     Plaintiff's duties as Maintenance Manager included supervising and assigning daily work orders to the maintenance staff, which included plumbing, HVAC, electrical, carpentry, and painting personnel.

24.     Defendant Randy Rice was named Campus Service Director on June 19, 2019.

25.     Defendant Rice was Plaintiff's immediate supervisor at the time of Plaintiff's termination.

26.     Defendant Bennie Montgomery was at all times material hereto, the Regional Director of Operations for Compass Group and/or SSC, and was Defendant Rice's supervisor.

27.     Soon after Defendant Rice took over as Campus Services Director, he told Plaintiff that at his previous accounts, the Campus Services Director normally supervised the maintenance department.

28.     Because Plaintiff's duties included supervising maintenance staff, Defendant Rice told Plaintiff that he did not "know what to do with" Plaintiff.

29.     During the last week of June 2020, Defendant Rice asked Plaintiff what his plans were going forward and if Plaintiff had any plans to retire.

30.     Plaintiff informed Defendant Rice that he did not have plans to retire because he was too young.

31.     Plaintiff was 64 years old.

32.     Defendant Rice then stated that he would be reducing the Maintenance Department by one full-time employee.

33.     Defendant Rice also asked Plaintiff if he would be willing to take a pay cut.

4

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

34.     Plaintiff told Defendant Rice that he had previously accepted a pay cut when Compass Group/SSC took over the Campus Services Department and did not wish to take a second one.

35.     On or about July 2, 2020, Defendant Rice called Plaintiff into his office.

36.     Defendant Rice was extremely angry and began berating Plaintiff about an e-mail he had received about the HVAC at Carver Hall, one of the lecture halls at Simpson College.

37.     Plaintiff told Defendant Rice that he had been working with the College's HVAC provider to correct the problems.

38.     On or about July 9, 2020, while he was off work, Plaintiff slipped on his kitchen floor and broke his femur.

39.     On or about July 10, 2020, Plaintiff was hospitalized and Defendants placed him on Short-Term Disability/Medical Leave of Absence/Family & Medical Leave Act (FMLA) leave for a six-month recovery/rehabilitation period.

40.     During Plaintiff's first several weeks of FMLA leave, he provided weekly status updates to Defendant Rice and to the Compass Group Leave of Absence Department.

41.     During the fourth week of Plaintiff's leave, Defendant Rice grew more distant and terse during these conversations.

42.     Eventually, Defendant Rice largely stopped answering Plaintiff's phone calls and text messages.

43.     When Defendant Rice would answer Plaintiff's phone calls he would do so in a threatening tone.

44.     During those call, Defendant Rice informed Plaintiff that "things would not be the same as they had been prior to [Plaintiff's] MLOA/FMLA leave."

45.     During one phone call, Defendant Rice informed Plaintiff that he had hired someone else to serve as maintenance supervisor.

46.     Defendant Rice told Plaintiff that this person would assume some of Plaintiff's job responsibilities, including directing the maintenance crew in their daily assignments.

47.     Defendant Rice also informed Plaintiff that he would "be on a very short leash" when he returned to work.

48.     Plaintiff later learned that Defendant Rice was making critical statements about Plaintiff to another employee and to an outside contractor while Plaintiff was on leave.

49.     For example, when Manager Dan Phillips, of HVAC Contractor Controlled Installation CI[3], asked about Plaintiff, Defendant Rice stated, "Why would Gary return to his job/. Gary would be better off retiring. I do not need him here anymore."

50.     Defendant Rice also told Plaintiff that he ran the department best and that it would "ruin his plan" if Plaintiff returned to work after his leave.

51.     Plaintiff's doctor cleared Plaintiff to return to work in November 2020.

52.     Plaintiff could perform the essential duties of his job with the use of a cane.

53.     Defendant Rice, however, refused to accommodate Plaintiff's cane.

54.     Because Defendant Rice refused to accommodate Plaintiff's cane, Plaintiff was forced to take additional leave until December 28, 2020.

55.     During this additional leave, Plaintiff received half pay.

6

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

56.     Plaintiff's surgeon released Plaintiff to return to work with no restrictions effective December 28, 2020.

57.     On or about December 17, 2020, Plaintiff hand delivered a copy of his medical release form to Defendant Rice.

58.     When Plaintiff delivered the medical release, Defendant Rice said "I would be crazy to let you return as Maintenance Manager."

59.     Defendant Rice also accused Plaintiff of having a "hero complex" and told Plaintiff that morale was high without him and that Plaintiff's return would "ruin" that.

60.     Plaintiff returned to work at 10:00 a.m. on December 28, 2020.

61.     Plaintiff met with Defendant Rice as instructed.

62.     During that meeting, Defendant Rice told Plaintiff that if it were up to him, Plaintiff would not allow him to return to his job.

63.     Defendant Rice told Plaintiff that he did not know what to do with him and wanted to put him on a 30-day probationary period.

64.     Defendant Rice also told Plaintiff that he had tried to report alleged issues with past jobs to Human Resources, but Human Resources informed him that his issues lacked sufficient documentation and were too far in the past.

65.     This discussion and probation were not backed up by written discipline.

66.     This discussion and probation did not comply with the employee handbook.

67.      Defendant Rice also told Plaintiff that there were engineers on campus performing assessments for energy projects and major maintenance planning.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

68.     Defendant Rice told Plaintiff that he was not to speak to these engineers and if Plaintiff did, he would be sent home.

69.     Defendant Rice then instructed Plaintiff to spend the next few days cleaning up his office and work truck.

70.     Defendant Rice also informed Plaintiff that the rules regarding the use of Plaintiff's work truck had changed.

71.     Previously, Plaintiff had been allowed to dive the truck on campus during the day and then drive the truck the four blocks to Plaintiff's home.

72.     Defendant Rice told Plaintiff that he would no longer be allowed to drive the truck home and would need to walk to work tasks on campus.

73.     Defendant Rice also told Plaintiff that he would have a "hard time" explaining to the maintenance staff that they no longer reported to him.

74.     Based on Defendant Rice's comments, Plaintiff believed that Defendants intended to make Plaintiff's work life so unbearable that he would quit.

75.     On or about December 29, 2020, Defendant Rice told Plaintiff that Plaintiff would be in charge of the plumbing and electrical staff.

76.     That same day, Plaintiff overheard a loud conference call between Defendant Rice, Defendant Montgomery, and Compass Group Human Resources outlining ways to prevent Plaintiff from resuming his work duties.

77.     There was no effort to make the call private.

78.     The call made Plaintiff very uncomfortable.

79.     Plaintiff again asked Defendant Rice about his work status.

8

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

80.     Defendant Rice told Plaintiff that he wanted to write Plaintiff up for work that had been in progress before his leave.

81.     Defendant Rice told Plaintiff that he was angry that Compass Group Human Resources would not let him do so.

82.     On or about January 4, 2020, Plaintiff met with Defendant Rice to discuss Defendant Rice's job expectations for Plaintiff.

83.     During this meeting, Defendant Rice told Plaintiff that Plaintiff did not do a good job managing his maintenance crew.

84.     Defendant Rice also told Plaintiff that he had "no confidence" in Plaintiff.

85.     Defendant Rice also told Plaintiff that he would fail.

86.     Defendant Rice then reversed his prior position and told Plaintiff that he was to manage all maintenance staff.

87.     Defendant Rice then stated that he had promised his supervisor and Simpson College that the number of work orders in the maintenance system would be down to 300 by February 1, 2021.

88.     Defendant Rice instructed Plaintiff to use a feature on the company maintenance application to assign priorities to all of the workers.

89.     On or about January 6, 2021, Defendant Rice called Plaintiff into his office and told Plaintiff that Michael Eagle from the Des Moines Metro Opera (DMMO) had called an specifically asked Plaintiff to attend a meeting that day with DMMO Simpson and Waldinger Mechanical.

90.     Defendant Rice told Plaintiff that Mr. Eagle wanted Plaintiff in the meeting because Plaintiff knew the ins and outs of the building.

9

91.     Defendant Rice started verbally attacking Plaintiff as a result of Mr. Eagle's comment.

92.     Defendant Rice then told Plaintiff not to attend the meeting.

93.     However, later that day Defendant Rice told Plaintiff that he should in fact attend the meeting at Blank Theater.

94.     Defendant Rice told Plaintiff that the meeting was at 12:30 p.m.

95.     Plaintiff was late to the meeting because Defendant Rice had given him the incorrect meeting time.

96.     Plaintiff later learned that the meeting was actually scheduled for noon and not 12:30 p.m.

97.     Plaintiff spent the weekend of January 7–9, 2021 closing out finalized work orders in the maintenance application.

98.     However, on or about January 11, 2021, Defendant Rice called Plaintiff into his office and told Plaintiff he was angry that Plaintiff closed out these orders.

99.     Plaintiff told Defendant Rice that he did so in connection with the instruction that he reduce the number of open orders in the system to 300 by February 1, 2021.

100.    Defendant Rice told Plaintiff that he was no allowed to close work orders on the system.

101.    All other managers were allowed to close work orders on the system.

102.    Additionally, it was past practice for managers to close work orders on the system.

103.    Defendant Rice also told Plaintiff that Defendant Montgomery had signed off on as much overtime as was needed to reduce the number of work orders to 300.

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

104. However, Defendant Rice informed Plaintiff that Plaintiff was not allowed to work overtime because it would eat into his bonus.

105. After the January 11 discussion with Defendant Rice, Plaintiff no longer was allowed to close work orders.

106. Defendant Rice, however, also would not close work orders himself for many days.

107. As a result, the number of open work orders was artificially inflated.

108. As a result, it appeared that Plaintiff's performance was poorer than it actually was.

109. In the past, Defendant Rice had told Plaintiff that poor performance cases were the best way to have an employee fired.

110. On or about January 19, 2021, Defendant Rice still was not closing any of the work orders than maintenance had completed.

111. On or about January 14, 2021, Defendant Rice told Plaintiff to take Work Truck SC11 home with him that night because there was a blizzard forecast.

112. Work Truck SC11 has a plow and a salter.

113. Defendant Rice then reminded Plaintiff that he still would be responsible for all of his regular work in addition to plowing snow and salting campus parking lots.

114. Defendant Rice then instructed Plaintiff to plow and salt for all snow events going forward with Work Truck SC11 As requested by the grounds manager Colton Metzger.

115. During the Monday Housing Zoom meeting on February 1, 2021, Compass Group/SCC employees were joking about the sub-zero temperatures.

116. Plaintiff joked that he had been sleeping with his boots on in case any "no heat" calls came through.

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

117.    Defendant Rice then told Plaintiff that the job was an example of Plaintiff's "hero complex."

118.    On or about February 5, 2021, Defendant Rice called Plaintiff into his office.

119.    When Plaintiff arrived at Defendant Rice's office he was on the phone with a Compass employee named William.

120.    Defendant Rice then handed Plaintiff documents that stated "Final Progressive Counseling."

121.    Plaintiff had never received first or second level disciplinary documents.

122.    Defendant Rice then proceed to go through Plaintiff's alleged performance issues while William was on the phone.

123.    A large portion of the write-up concerned the number of open work orders.

124.    Plaintiff asked Defendant Rice what he could do to improve.

125.    Defendant Rice told Plaintiff that he'd had a plan to reduce the work numbers but that Plaintiff's return from leave ruined that plan.

126.    As Plaintiff left the meeting, Defendant Rice went into an area with other managers and started whooping and laughing.

127.    On or about February 10, 2021, Defendant Rice still had not closed out Plaintiff's finalized work orders.

128.    Other managers expressed their concern to Plaintiff.

129.    Plaintiff asked Defendant Rice if they would meet regarding the finalized work orders, but Defendant Rice said no.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

130.     Meanwhile, on Sunday, February 7, 2021, Plaintiff contacted Colton Metzger to see if he needed Plaintiff to come to work that morning to help plow and salt the campus parking lots.

131.     In doing so, Plaintiff was following the chain of command approval that Defendant Rice required.

132.     Mr. Metzer responded that Plaintiff's help would be appreciated and that the Grounds Crew was starting at 5 a.m.

133.     Plaintiff reported to campus and began plowing the parking lot near Wallace Hall.

134.     There were a lot of cars in the parking lot because of the Indianola Snow Ordinance.

135.     As a result of the Snow Ordinance, a lot of students who normally park on the street had moved their cars into the lot.

136.     While Plaintiff was plowing the East Lane of the Wallace Lot, he was backing his truck up to make another pass forward.

137.     Plaintiff did not see any vehicles behind him in his mirrors.

138.     However, while Plaintiff was backing up, he heard a crunching noise.

139.     Plaintiff pulled forward and exited the truck.

140.     Plaintiff saw that he had backed into a car that was sticking farther out into the traffic lane than those around it.

141.     Plaintiff immediately inspected the car and the work truck and found minor damage to the car's rear tail light and rear bumper.

142.     Plaintiff did not see any damage to the work truck (Work Truck SC11).

143.     Plaintiff called his supervisor, Defendant Rice, immediately.

13

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

144.     Defendant Rice told Plaintiff that "accidents happen" and instructed Plaintiff to take photographs of the car damage.

145.     Plaintiff then filled out and made copies of the Drivers Report of Accident.

146.     Plaintiff left copies of the Drivers Report of Accident on the car's windshield.

147.     Plaintiff also called Simpson College Security with the parking pass and license plate number so the owner could be identified and notified.

148.     Plaintiff followed all company procedures for vehicle accidents.

149.     Because the damage to the vehicle was minor and no one was injured, the police were not called.

150.     Following the accident, Plaintiff continued plowing.

151.     On or about February 9, 2021, Plaintiff was cleared to plow snow.

152.     That same day, Defendant Rice and William for SCC Human Resources attended the pre-shift meeting with Plaintiff and his crew.

153.     Plaintiff did not know why they were present other than to monitor him.

154.     On or about February 11, 2021, Defendant Rice became very angry with Plaintiff regarding the repair of refrigerant leaks in the mainframe computer room.

155.     Defendant Rice told Plaintiff that the company performing the repairs cost too much money.

156.     Defendant Rice then pulled his stocking hat over his eyes, shook his head, and said Plaintiff was running the repair project badly.

157.     Plaintiff responded that the repairs being performed were in the best interest of the mainframe room integrity.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

158.    Defendant Rice accused Plaintiff of suggesting that he did not understand the importance of the project.

159.    Defendant Rice then asked, "How do you want to have it done when we terminate you? Do you want to do it at the beginning or end of the day? Do you want someone in there?"

160.    Plaintiff was afraid for his job and asked if he was being fired.

161.    Defendant Rice said, "You don't have to worry that you are being fired. Not today. Not tomorrow."

162.    Defendant Rice's voice was so loud that it could be heard by all of the other managers and hourly workers waiting to clock into work.

163.    On or about February 12, 2021, Defendant Rice sent an email to Plaintiff with a meeting request for 2 p.m. on Monday February 15, 2021.

164.    The meeting was described as a "discussion."

165.    Plaintiff asked Defendant Rice if the meeting was about terminating his employment.

166.    Defendant Rice said, "No. It's just a discussion."

167.    On or about Sunday, February 14, 2021, Plaintiff was assigned to plow and salt the parking lots for four hours.

168.    On or about February 15, 2021, Plaintiff went to Defendant Rice's office.

169.    Defendant Rice then made a call to Defendant Bennie Montgomery, USA Regional Director of Operations for Defendants Compass Group/SCC.

170.    Defendant Rice then handed Plaintiff termination papers and told Plaintiff that Defendants Compass Group and SCC were terminating him as of midnight that day for willful destruction of company or client property during the minor car accident on February 7, 2021.

171.    Plaintiff told Defendants Rice and Montgomery that the damage had been an accident.

172.    Plaintiff also stated that he did not intentionally run into anything.

173.    Plaintiff also was confused because he had been assigned to continue plowing for eight days following the accident.

174.    In fact, Plaintiff had been assigned to plow for four hours just the day before his termination.

175.    Other employees had been involved in work-related vehicle accidents throughout the last year and a half and none of those employees had been terminated.

176.    Plaintiff then was told to sign the termination papers that Defendant Rice placed in front of him.

177.    Defendant Rice also told Plaintiff that it did not matter if Plaintiff signed the paperwork or not because the termination would still go through.

178.    Plaintiff also was informed that his family's health insurance would be cut off at midnight that night.

179.    Plaintiff then was told to gather his personal items and to turn in his phone ank keys.

180.    Plaintiff then left the property.

181.    Plaintiff was 64 years old at the time of his termination.

16

182.    At the time of his termination, Plaintiff had been a maintenance employee at Simpson College for approximately 33 years.

## COUNT I – WRONGFUL TERMINATION—AGE DISCRIMINATION (IOWA CODE CHAPTER 216 AND 29 U.S.C. § 621 ET SEQ. )

183.    Plaintiff repleads and incorporates Paragraphs 1–182 and 327–602 as if pled here.

184.    The Defendants in this case treated Plaintiff differently in the terms and conditions of his employment based on his age.

185.    Plaintiff is over the age of 40.

186.    At the time of Plaintiff's termination, he was 64 years old.

187.    In or about October 1988, Plaintiff started working at Simpson College as a Maintenance Tech.

188.    In or about 1990, Plaintiff became Acting Director of Campus Services and then Assistant Director for Campus Services.

189.    Simpson College later outsourced its Campus Services Department to Marriot Campus Services.

190.    After Marriott took over the Campus Services Department at Simpson College, Plaintiff assumed the position of Assistant to the Director/Maintenance Manager.

191.    Marriot Campus Services later became Sodexho Campus Services, and in or about Spring 2017, the District Manager for Sodexho asked Plaintiff to serve as the Acting Campus Services Director.

192.    Plaintiff served as Acting Campus Services Director until on or about June 15, 2019.

17

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

193.    At that time, Simpson College had ended its contract with Sodexho and changed its Campus Services provider to Compass Group/SSC.

194.    At the time of Plaintiff's termination, he was employed as a Maintenance Manager.

195.    Plaintiff's duties as Maintenance Manager included supervising and assigning daily work orders to the maintenance staff, which included plumbing, HVAC, electrical, carpentry, and painting personnel.

196.    Defendant Randy Rice was named Campus Service Director on June 19, 2019.

197.    Defendant Rice was Plaintiff's immediate supervisor at the time of Plaintiff's termination.

198.    Soon after Defendant Rice took over as Campus Services Director, he told Plaintiff that at his previous accounts, the Campus Services Director normally supervised the maintenance department.

199.    Because Plaintiff's duties included supervising maintenance staff, Defendant Rice told Plaintiff that he did not "know what to do with" Plaintiff.

200.    During the last week of June 2020, Defendant Rice asked Plaintiff what his plans were going forward and if Plaintiff had any plans to retire.

201.    Plaintiff informed Defendant Rice that he did not have plans to retire because he was too young.

202.    Defendant Rice then stated that he would be reducing the Maintenance Department by one full-time employee.

203.    Defendant Rice also asked Plaintiff if he would be willing to take a pay cut.

204.    Plaintiff told Defendant Rice that he had previously accepted a pay cut when Compass Group/SSC took over the Campus Services Department and did not wish to take a second one.

205.    On or about July 10, 2020, Plaintiff was hospitalized and Defendants placed him on Short-Term Disability/Medical Leave of Absence/Family & Medical Leave Act (FMLA) leave for a six-month recovery/rehabilitation period due to a broken femur.

206.    During Plaintiff's leave, Defendant Rice informed Plaintiff that he had hired someone else to serve as maintenance supervisor.

207.    Defendant Rice told Plaintiff that this person would assume some of Plaintiff's job responsibilities, including directing the maintenance crew in their daily assignments.

208.    Defendant Rice also informed Plaintiff that he would "be on a very short leash" when he returned to work.

209.    Plaintiff later learned that Defendant Rice was making critical statements about Plaintiff to another employee and to an outside contractor while Plaintiff was on leave.

210.    For example, when Manager Dan Phillips, of HVAC Contractor Controlled Installation CI[3], asked about Plaintiff, Defendant Rice stated, "Why would Gary return to his job. Gary would be better off retiring. I do not need him here anymore."

211.    Defendant Rice also told Plaintiff that he ran the department best and that it would "ruin his plan" if Plaintiff returned to work after his leave.

212.    On or about December 17, 2020, Plaintiff hand delivered a copy of his medical release form to Defendant Rice.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

213.    When Plaintiff delivered the medical release, Defendant Rice said "I would be crazy to let you return as Maintenance Manager."

214.    Defendant Rice also accused Plaintiff of having a "hero complex" and told Plaintiff that morale was high without him and that Plaintiff's return would "ruin" that.

215.    Plaintiff returned to work at 10:00 a.m. on December 28, 2020.

216.    Plaintiff met with Defendant Rice as instructed.

217.    During that meeting, Defendant Rice told Plaintiff that if it were up to him, Plaintiff would not allow him to return to his job.

218.    Defendant Rice told Plaintiff that he did not know what to do with him and wanted to put him on a 30-day probationary period.

219.    Defendant Rice also told Plaintiff that he had tried to report alleged issues with past jobs to Human Resources, but Human Resources informed him that his issues lacked sufficient documentation and were too far in the past.

220.    This discussion and probation were not backed up by written discipline.

221.    This discussion and probation did not comply with the employee handbook.

222.     Defendant Rice also told Plaintiff that there were engineers on campus performing assessments for energy projects and major maintenance planning.

223.    Defendant Rice told Plaintiff that he was not to speak to these engineers and if Plaintiff did, he would be sent home.

224.    Defendant Rice then instructed Plaintiff to spend the next few days cleaning up his office and work truck.

20

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

225.    Defendant Rice also informed Plaintiff that the rules regarding the use of Plaintiff's work truck had changed.

226.    Previously, Plaintiff had been allowed to drive the truck on campus during the day and then drive the truck the four blocks to Plaintiff's home.

227.    Defendant Rice told Plaintiff that he would no longer be allowed to drive the truck home and would need to walk to work tasks on campus.

228.    Defendant Rice also told Plaintiff that he would have a "hard time" explaining to the maintenance staff that they no longer reported to him.

229.    Based on Defendant Rice's comments, Plaintiff believed that Defendants intended to make Plaintiff's work life so unbearable that he would quit.

230.    On or about December 29, 2020, Defendant Rice told Plaintiff that Plaintiff would be in charge of the plumbing and electrical staff.

231.    That same day, Plaintiff overheard a loud conference call between Defendant Rice, Defendant Montgomery, and Compass Group Human Resources outlining ways to prevent Plaintiff from resuming his work duties.

232.    There was no effort to make the call private.

233.    The call made Plaintiff very uncomfortable.

234.    Plaintiff again asked Defendant Rice about his work status.

235.    Defendant Rice told Plaintiff that he wanted to write Plaintiff up for work that had been in progress before his leave.

236.    Defendant Rice told Plaintiff that he was angry that Compass Group Human Resources would not let him do so.

21

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

237.    On or about January 4, 2020, Plaintiff met with Defendant Rice to discuss Defendant Rice's job expectations for Plaintiff.

238.    During this meeting, Defendant Rice told Plaintiff that Plaintiff did not do a good job managing his maintenance crew.

239.    Defendant Rice also told Plaintiff that he had "no confidence" in Plaintiff.

240.    Defendant Rice also told Plaintiff that he would fail.

241.    Defendant Rice then reversed his prior position and told Plaintiff that he was to manage all maintenance staff.

242.    Defendant Rice then stated that he had promised his supervisor and Simpson College that the number of work orders in the maintenance system would be down to 300 by February 1, 2021.

243.    Defendant Rice instructed Plaintiff to use a feature on the company maintenance application to assign priorities to all of the workers.

244.    On or about January 6, 2021, Defendant Rice called Plaintiff into his office and told Plaintiff that Michael Eagle from the Des Moines Metro Opera (DMMO) had called an specifically asked Plaintiff to attend a meeting that day with DMMO Simpson and Waldinger Mechanical.

245.    Defendant Rice told Plaintiff that Mr. Eagle wanted Plaintiff in the meeting because Plaintiff knew the ins and outs of the building.

246.    Defendant Rice started verbally attacking Plaintiff as a result of Mr. Eagle's comment.

247.    Defendant Rice then told Plaintiff not to attend the meeting.

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

248.    However, later that day Defendant Rice told Plaintiff that he should in fact attend the meeting at Blank Theater.

249.    Defendant Rice told Plaintiff that the meeting was at 12:30 p.m.

250.    Plaintiff was late to the meeting because Defendant Rice had given him the incorrect meeting time.

251.    Plaintiff later learned that the meeting was actually scheduled for noon and not 12:30 p.m.

252.    Plaintiff spent the weekend of January 7–9, 2021 closing out finalized work orders in the maintenance application.

253.    However, on or about January 11, 2021, Defendant Rice called Plaintiff into his office and told Plaintiff he was angry that Plaintiff closed out these orders.

254.    Plaintiff told Defendant Rice that he did so in connection with the instruction that he reduce the number of open orders in the system to 300 by February 1, 2021.

255.    Defendant Rice told Plaintiff that he was no allowed to close work orders on the system.

256.    All other managers were allowed to close work orders on the system.

257.    Additionally, it was past practice for managers to close work orders on the system.

258.    Defendant Rice also told Plaintiff that Defendant Montgomery had signed off on as much overtime as was needed to reduce the number of work orders to 300.

259.    However, Defendant Rice informed Plaintiff that Plaintiff was not allowed to work overtime because it would eat into his bonus.

23

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

260.    After the January 11 discussion with Defendant Rice, Plaintiff no longer was allowed to close work orders.

261.    Defendant Rice, however, also would not close work orders himself for many days.

262.    As a result, the number of open work orders was artificially inflated.

263.    As a result, it appeared that Plaintiff's performance was poorer than it actually was.

264.    In the past, Defendant Rice had told Plaintiff that poor performance cases were the best way to have an employee fired.

265.    On or about January 19, 2021, Defendant Rice still was not closing any of the work orders than maintenance had completed.

266.    n or about January 14, 2021, Defendant Rice told Plaintiff to take Work Truck SC11 home with him that night because there was a blizzard forecast.

267.    Work Truck SC11 has a plow and a salter.

268.    Defendant Rice then reminded Plaintiff that he still would be responsible for all of his regular work in addition to plowing snow and salting campus parking lots.

269.    Defendant Rice then instructed Plaintiff to plow and salt for all snow events going forward with Work Truck SC11 As requested by the grounds manager Colton Metzger.

270.    On or about February 5, 2021, Defendant Rice called Plaintiff into his office.

271.    When Plaintiff arrived at Defendant Rice's office, he was on the phone with a Compass employee named William.

272.    Defendant Rice then handed Plaintiff documents that stated "Final Progressive Counseling."

273.    Plaintiff had never received first or second level disciplinary documents.

24

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

274.    Defendant Rice then proceed to go through Plaintiff's alleged performance issues while William was on the phone.

275.    A large portion of the write-up concerned the number of open work orders.

276.    Plaintiff asked Defendant Rice what he could do to improve.

277.    Defendant Rice told Plaintiff that he'd had a plan to reduce the work numbers but that Plaintiff's return from leave ruined that plan.

278.    As Plaintiff left the meeting, Defendant Rice went into an area with other managers and started whooping and laughing.

279.    On or about February 10, 2021, Defendant Rice still had not closed out Plaintiff's finalized work orders.

280.    Other managers expressed their concern to Plaintiff.

281.    Plaintiff asked Defendant Rice if they would meet regarding the finalized work orders, but Defendant Rice said no.

282.    Meanwhile, on Sunday, February 7, 2021, Plaintiff contacted Colton Metzger to see if he needed Plaintiff to come to work that morning to help plow and salt the campus parking lots.

283.    In doing so, Plaintiff was following the chain of command approval that Defendant Rice required.

284.    Mr. Metzer responded that Plaintiff's help would be appreciated and that the Grounds Crew was starting at 5 a.m.

285.    Plaintiff reported to campus and began plowing the parking lot near Wallace Hall.

286.    There were a lot of cars in the parking lot because of the Indianola Snow Ordinance.

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

287.    As a result of the Snow Ordinance, a lot of students who normally park on the street had moved their cars into the lot.

288.    While Plaintiff was plowing the East Lane of the Wallace Lot, he was backing his truck up to make another pass forward.

289.    Plaintiff did not see any vehicles behind him in his mirrors.

290.    However, while Plaintiff was backing up, he heard a crunching noise.

291.    Plaintiff pulled forward and exited the truck.

292.    Plaintiff saw that he had backed into a car that was sticking farther out into the traffic lane than those around it.

293.    Plaintiff immediately inspected the car and the work truck and found minor damage to the car's rear tail light and rear bumper.

294.    Plaintiff did not see any damage to the work truck (Work Truck SC11).

295.    Plaintiff called his supervisor, Defendant Rice, immediately.

296.    Defendant Rice told Plaintiff that "accidents happen" and instructed Plaintiff to take photographs of the car damage.

297.    Plaintiff then filled out and made copies of the Drivers Report of Accident.

298.    Plaintiff left copies of the Drivers Report of Accident on the car's windshield.

299.    Plaintiff also called Simpson College Security with the parking pass and license plate number so the owner could be identified and notified.

300.    Plaintiff followed all company procedures for vehicle accidents.

301.    Because the damage to the vehicle was minor and no one was injured, the police were not called.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

302.    Following the accident, Plaintiff continued plowing.

303.    On or about February 12, 2021, Defendant Rice sent an email to Plaintiff with a meeting request for 2 p.m. on Monday February 15, 2021.

304.    The meeting was described as a "discussion."

305.    Plaintiff asked Defendant Rice if the meeting was about terminating his employment.

306.    Defendant Rice said, "No. It's just a discussion."

307.    On or about Sunday, February 14, 2021, Plaintiff was assigned to plow and salt the parking lots for four hours.

308.    On or about February 15, 2021, Plaintiff went to Defendant Rice's office.

309.    Defendant Rice then made a call to Defendant Bennie Montgomery, USA Regional Director of Operations for Defendants Compass Group/SCC.

310.    Defendant Rice then handed Plaintiff termination papers and told Plaintiff that Defendants Compass Group and SCC were terminating him as of midnight that day for willful destruction of company or client property during the minor car accident on February 7, 2021.

311.    Plaintiff told Defendants Rice and Montgomery that the damage had been an accident.

312.    Plaintiff also stated that he did not intentionally run into anything.

313.    Plaintiff also was confused because he had been assigned to continue plowing for eight days following the accident.

314.    In fact, Plaintiff had been assigned to plow for four hours just the day before his termination.

27

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

315.    Other employees had been involved in work-related vehicle accidents throughout the last year and a half and none of those employees had been terminated.

316.    Plaintiff then was told to sign the termination papers that Defendant Rice placed in front of him.

317.    Defendant Rice also told Plaintiff that it did not matter if Plaintiff signed the paperwork or not because the termination would still go through.

318.    Plaintiff also was informed that his family's health insurance would be cut off at midnight that night.

319.    Plaintiff then was told to gather his personal items and to turn in his phone and keys.

320.    Plaintiff then left the property.

321.    At the time of his termination, Plaintiff had been a maintenance employee at Simpson College for approximately 33 years.

322.    The Defendants actions violated Iowa Code Chapter 216 and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.

323.    Defendants' actions violated Iowa Code Chapter 216 and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., in such other ways as the evidence may demonstrate.

324.    Defendants' actions were the proximate cause of Plaintiff's damages.

325.    Plaintiff has suffered the damages of loss of past and future wages, benefits and other expenses, damages to reputation, pain and suffering, and has incurred attorney fees and expenses and such other proximate damages as are shown by the evidence.

326.    The actions of Defendants were willful and wonton, which warrant an award of punitive and/or liquidated damages.

**WHEREFORE**, the Plaintiff, Gary Ray Dooley, respectfully prays for judgment against Defendants Compass Group USA, Inc., Southeast Service Corporation, Randy Rice, and Bennie Montgomery in a sum deemed reasonable and proper for compensatory damages, and a sum deemed reasonable and proper for punitive or exemplary damages, for cost and interest and such other or further relief as just and proper.

**COUNT II —— HOSTILE WORK ENVIRONMENT/HARASSMENT—AGE**

**DISCRIMINATION (IOWA CODE CHAPTER 216 AND 29 U.S.C. § 621 ET SEQ. )**

327.    Plaintiff repleads and incorporates Paragraphs 1–326 and 451–602 as if pled here.

328.    The Defendants in this case treated Plaintiff differently in the terms and conditions of his employment based on his age.

329.    The Plaintiff is over the age of 40.

330.    At the time of Plaintiff's termination, he was 64 years old.

331.    Plaintiff is over the age of 40.

332.    At the time of Plaintiff's termination, he was 64 years old.

333.    In or about October 1988, Plaintiff started working at Simpson College as a Maintenance Tech.

334.    In or about 1990, Plaintiff became Acting Director of Campus Services and then Assistant Director for Campus Services.

335.    Simpson College later outsourced its Campus Services Department to Marriot Campus Services.

29

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

336.    After Marriott took over the Campus Services Department at Simpson College, Plaintiff assumed the position of Assistant to the Director/Maintenance Manager.

337.    Marriot Campus Services later became Sodexho Campus Services, and in or about Spring 2017, the District Manager for Sodexho asked Plaintiff to serve as the Acting Campus Services Director.

338.    Plaintiff served as Acting Campus Services Director until on or about June 15, 2019.

339.    At that time, Simpson College had ended its contract with Sodexho and changed its Campus Services provider to Compass Group/SSC.

340.    At the time of Plaintiff's termination, he was employed as a Maintenance Manager.

341.    Plaintiff's duties as Maintenance Manager included supervising and assigning daily work orders to the maintenance staff, which included plumbing, HVAC, electrical, carpentry, and painting personnel.

342.    Defendant Randy Rice was named Campus Service Director on June 19, 2019.

343.    Defendant Rice was Plaintiff's immediate supervisor at the time of Plaintiff's termination.

344.    Soon after Defendant Rice took over as Campus Services Director, he told Plaintiff that at his previous accounts, the Campus Services Director normally supervised the maintenance department.

345.    Because Plaintiff's duties included supervising maintenance staff, Defendant Rice told Plaintiff that he did not "know what to do with" Plaintiff.

30

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

346.    During the last week of June 2020, Defendant Rice asked Plaintiff what his plans were going forward and if Plaintiff had any plans to retire.

347.    Plaintiff informed Defendant Rice that he did not have plans to retire because he was too young.

348.    Defendant Rice then stated that he would be reducing the Maintenance Department by one full-time employee.

349.    Defendant Rice also asked Plaintiff if he would be willing to take a pay cut.

350.    Plaintiff told Defendant Rice that he had previously accepted a pay cut when Compass Group/SSC took over the Campus Services Department and did not wish to take a second one.

351.    On or about July 10, 2020, Plaintiff was hospitalized and Defendants placed him on Short-Term Disability/Medical Leave of Absence/Family & Medical Leave Act (FMLA) leave for a six-month recovery/rehabilitation period due to a broken femur.

352.    During Plaintiff's leave, Defendant Rice informed Plaintiff that he had hired someone else to serve as maintenance supervisor.

353.    Defendant Rice told Plaintiff that this person would assume some of Plaintiff's job responsibilities, including directing the maintenance crew in their daily assignments.

354.    Defendant Rice also informed Plaintiff that he would "be on a very short leash" when he returned to work.

355.    Plaintiff later learned that Defendant Rice was making critical statements about Plaintiff to another employee and to an outside contractor while Plaintiff was on leave.

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

356.    For example, when Manager Dan Phillips, of HVAC Contractor Controlled Installation CI[3], asked about Plaintiff, Defendant Rice stated, "Why would Gary return to his job. Gary would be better off retiring. I do not need him here anymore."

357.    Defendant Rice also told Plaintiff that he ran the department best and that it would "ruin his plan" if Plaintiff returned to work after his leave.

358.    On or about December 17, 2020, Plaintiff hand delivered a copy of his medical release form to Defendant Rice.

359.    When Plaintiff delivered the medical release, Defendant Rice said "I would be crazy to let you return as Maintenance Manager."

360.    Defendant Rice also accused Plaintiff of having a "hero complex" and told Plaintiff that morale was high without him and that Plaintiff's return would "ruin" that.

361.    Plaintiff returned to work at 10:00 a.m. on December 28, 2020.

362.    Plaintiff met with Defendant Rice as instructed.

363.    During that meeting, Defendant Rice told Plaintiff that if it were up to him, Plaintiff would not allow him to return to his job.

364.    Defendant Rice told Plaintiff that he did not know what to do with him and wanted to put him on a 30-day probationary period.

365.    Defendant Rice also told Plaintiff that he had tried to report alleged issues with past jobs to Human Resources, but Human Resources informed him that his issues lacked sufficient documentation and were too far in the past.

366.    This discussion and probation were not backed up by written discipline.

367.    This discussion and probation did not comply with the employee handbook.

368.   Defendant Rice also told Plaintiff that there were engineers on campus performing assessments for energy projects and major maintenance planning.

369.   Defendant Rice told Plaintiff that he was not to speak to these engineers and if Plaintiff did, he would be sent home.

370.   Defendant Rice then instructed Plaintiff to spend the next few days cleaning up his office and work truck.

371.   Defendant Rice also informed Plaintiff that the rules regarding the use of Plaintiff's work truck had changed.

372.   Previously, Plaintiff had been allowed to drive the truck on campus during the day and then drive the truck the four blocks to Plaintiff's home.

373.   Defendant Rice told Plaintiff that he would no longer be allowed to drive the truck home and would need to walk to work tasks on campus.

374.   Defendant Rice also told Plaintiff that he would have a "hard time" explaining to the maintenance staff that they no longer reported to him.

375.   Based on Defendant Rice's comments, Plaintiff believed that Defendants intended to make Plaintiff's work life so unbearable that he would quit.

376.   On or about December 29, 2020, Defendant Rice told Plaintiff that Plaintiff would be in charge of the plumbing and electrical staff.

377.   That same day, Plaintiff overheard a loud conference call between Defendant Rice, Defendant Montgomery, and Compass Group Human Resources outlining ways to prevent Plaintiff from resuming his work duties.

378.   There was no effort to make the call private.

33

379.    The call made Plaintiff very uncomfortable.

380.    Plaintiff again asked Defendant Rice about his work status.

381.    Defendant Rice told Plaintiff that he wanted to write Plaintiff up for work that had been in progress before his leave.

382.    Defendant Rice told Plaintiff that he was angry that Compass Group Human Resources would not let him do so.

383.    On or about January 4, 2020, Plaintiff met with Defendant Rice to discuss Defendant Rice's job expectations for Plaintiff.

384.    During this meeting, Defendant Rice told Plaintiff that Plaintiff did not do a good job managing his maintenance crew.

385.    Defendant Rice also told Plaintiff that he had "no confidence" in Plaintiff.

386.    Defendant Rice also told Plaintiff that he would fail.

387.    Defendant Rice then reversed his prior position and told Plaintiff that he was to manage all maintenance staff.

388.    Defendant Rice then stated that he had promised his supervisor and Simpson College that the number of work orders in the maintenance system would be down to 300 by February 1, 2021.

389.    Defendant Rice instructed Plaintiff to use a feature on the company maintenance application to assign priorities to all of the workers.

390.    On or about January 6, 2021, Defendant Rice called Plaintiff into his office and told Plaintiff that Michael Eagle from the Des Moines Metro Opera (DMMO) had called an specifically asked Plaintiff to attend a meeting that day with DMMO Simpson and Waldinger Mechanical.

34

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

391. Defendant Rice told Plaintiff that Mr. Eagle wanted Plaintiff in the meeting because Plaintiff knew the ins and outs of the building.

392. Defendant Rice started verbally attacking Plaintiff as a result of Mr. Eagle's comment.

393. Defendant Rice then told Plaintiff not to attend the meeting.

394. However, later that day Defendant Rice told Plaintiff that he should in fact attend the meeting at Blank Theater.

395. Defendant Rice told Plaintiff that the meeting was at 12:30 p.m.

396. Plaintiff was late to the meeting because Defendant Rice had given him the incorrect meeting time.

397. Plaintiff later learned that the meeting was actually scheduled for noon and not 12:30 p.m.

398. Plaintiff spent the weekend of January 7–9, 2021 closing out finalized work orders in the maintenance application.

399. However, on or about January 11, 2021, Defendant Rice called Plaintiff into his office and told Plaintiff he was angry that Plaintiff closed out these orders.

400. Plaintiff told Defendant Rice that he did so in connection with the instruction that he reduce the number of open orders in the system to 300 by February 1, 2021.

401. Defendant Rice told Plaintiff that he was no allowed to close work orders on the system.

402. All other managers were allowed to close work orders on the system.

403. Additionally, it was past practice for managers to close work orders on the system.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

404.    Defendant Rice also told Plaintiff that Defendant Montgomery had signed off on as much overtime as was needed to reduce the number of work orders to 300.

405.    However, Defendant Rice informed Plaintiff that Plaintiff was not allowed to work overtime because it would eat into his bonus.

406.    After the January 11 discussion with Defendant Rice, Plaintiff no longer was allowed to close work orders.

407.    Defendant Rice, however, also would not close work orders himself for many days.

408.    As a result, the number of open work orders was artificially inflated.

409.    As a result, it appeared that Plaintiff's performance was poorer than it actually was.

410.    In the past, Defendant Rice had told Plaintiff that poor performance cases were the best way to have an employee fired.

411.    On or about January 19, 2021, Defendant Rice still was not closing any of the work orders than maintenance had completed.

412.    On or about February 5, 2021, Defendant Rice called Plaintiff into his office.

413.    When Plaintiff arrived at Defendant Rice's office, he was on the phone with a Compass employee named William.

414.    Defendant Rice then handed Plaintiff documents that stated "Final Progressive Counseling."

415.    Plaintiff had never received first or second level disciplinary documents.

416.    Defendant Rice then proceed to go through Plaintiff's alleged performance issues while William was on the phone.

417.    A large portion of the write-up concerned the number of open work orders.

36

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

418.    Plaintiff asked Defendant Rice what he could do to improve.

419.    Defendant Rice told Plaintiff that he'd had a plan to reduce the work numbers but that Plaintiff's return from leave ruined that plan.

420.    As Plaintiff left the meeting, Defendant Rice went into an area with other managers and started whooping and laughing.

421.    On or about February 10, 2021, Defendant Rice still had not closed out Plaintiff's finalized work orders.

422.    Other managers expressed their concern to Plaintiff.

423.    Plaintiff asked Defendant Rice if they would meet regarding the finalized work orders, but Defendant Rice said no.

424.    That same day, Defendant Rice and William for SCC Human Resources attended the pre-shift meeting with Plaintiff and his crew.

425.    Plaintiff did not know why they were present other than to monitor him.

426.    On or about February 11, 2021, Defendant Rice became very angry with Plaintiff regarding the repair of refrigerant leaks in the mainframe computer room.

427.    Defendant Rice told Plaintiff that the company performing the repairs cost too much money.

428.    Defendant Rice then pulled his stocking hat over his eyes, shook his head, and said Plaintiff was running the repair project badly.

429.    Plaintiff responded that the repairs being performed were in the best interest of the mainframe room integrity.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

430.    Defendant Rice accused Plaintiff of suggesting that he did not understand the importance of the project.

431.    Defendant Rice then asked, "How do you want to have it done when we terminate you? Do you want to do it at the beginning or end of the day? Do you want someone in there?"

432.    Plaintiff was afraid for his job and asked if he was being fired.

433.    Defendant Rice said, "You don't have to worry that you are being fired. Not today. Not tomorrow."

434.    Defendant Rice's voice was so loud that it could be heard by all of the other managers and hourly workers waiting to clock into work.

435.    On or about February 15, 2021, Defendant Rice handed Plaintiff termination papers and told Plaintiff that Defendants Compass Group and SCC were terminating him as of midnight that day for willful destruction of company or client property during a minor car accident on February 7, 2021.

436.    Plaintiff told Defendants Rice and Montgomery that the damage had been an accident.

437.    Plaintiff also stated that he did not intentionally run into anything.

438.    Plaintiff also was confused because he had been assigned to continue plowing for eight days following the accident.

439.    In fact, Plaintiff had been assigned to plow for four hours just the day before his termination.

440.    Other employees had been involved in work-related vehicle accidents throughout the last year and a half and none of those employees had been terminated.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

441.   The hostile work environment consisted of the facts alleged above.

442.   The hostile work environment consisted of other such facts as the evidence will show.

443.   This harassment occurred nearly every day.

444.   This harassment continued until the day Plaintiff was terminated.

445.   This harassment was because of Plaintiff's real or perceived disability.

446.   This harassment consisted of other such facts as the evidence will show.

447.   Defendants' actions violated Iowa Code Chapter 216.

448.   Defendants' actions violated Chapter 216 in other such ways as the evidence may demonstrate.

449.   Defendants' actions were the proximate cause of Plaintiff's damages.

450.   Plaintiff has suffered the damages of loss of past and future wages, benefits and other expenses, damages to reputation, pain and suffering, and has incurred attorney fees and expenses and such other proximate damages as are shown by the evidence.

**WHEREFORE**, the Plaintiff, Gary Ray Dooley, respectfully prays for judgment against Defendants Compass Group USA, Inc., Southeast Service Corporation, Randy Rice, and Bennie Montgomery in a sum deemed reasonable and proper for compensatory damages, and a sum deemed reasonable and proper for punitive or exemplary damages, for cost and interest and such other or further relief as just and proper.

## COUNT III ——VIOLATION OF RIGHTS UNDER THE FAMILY AND MEDICAL LEAVE ACT (29 U.S.C. § 2601 et seq.)

451.   Plaintiff repleads and incorporates Paragraphs 1–450 as if pled here.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

452.    The Defendants' actions in terminating the Plaintiff were on the basis of age and his usage of FMLA leave, and were in violation of Plaintiff's substantial rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

453.    Defendant Compass Group is a private employer with more than 50 employees.

454.    Defendant SSC is a private employer with more than 50 employees

455.    Plaintiff worked for a covered employer.

456.    Plaintiff worked more than 1,250 hours during the 12 months prior to the start of his FMLA leave.

457.    Plaintiff worked at a location where 50 or more employees work at his location or within 75 miles of it.

458.    Plaintiff worked for his employer for more than 12 months at the time he requested FMLA leave.

459.    On or about July 9, 2020, while he was off work, Plaintiff slipped on his kitchen floor and broke his femur.

460.    On or about July 10, 2020, Plaintiff was hospitalized and Defendants placed him on Short-Term Disability/Medical Leave of Absence/Family & Medical Leave Act (FMLA) leave for a six-month recovery/rehabilitation period.

461.    During Plaintiff's first several weeks of FMLA leave, he provided weekly status updates to Defendant Rice and to the Compass Group Leave of Absence Department.

462.    During the fourth week of Plaintiff's leave, Defendant Rice grew more distant and terse during these conversations.

40

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

463.    Eventually, Defendant Rice largely stopped answering Plaintiff's phone calls and text messages.

464.    When Defendant Rice would answer Plaintiff's phone calls he would do so in a threatening tone.

465.    During those call, Defendant Rice informed Plaintiff that "things would not be the same as they had been prior to [Plaintiff's] MLOA/FMLA leave."

466.    During one phone call, Defendant Rice informed Plaintiff that he had hired someone else to serve as maintenance supervisor.

467.    Defendant Rice told Plaintiff that this person would assume some of Plaintiff's job responsibilities, including directing the maintenance crew in their daily assignments.

468.    Defendant Rice also informed Plaintiff that he would "be on a very short leash" when he returned to work.

469.    Plaintiff later learned that Defendant Rice was making critical statements about Plaintiff to another employee and to an outside contractor while Plaintiff was on leave.

470.    For example, when Manager Dan Phillips, of HVAC Contractor Controlled Installation CI[3], asked about Plaintiff, Defendant Rice stated, "Why would Gary return to his job/. Gary would be better off retiring. I do not need him here anymore."

471.    Defendant Rice also told Plaintiff that he ran the department best and that it would "ruin his plan" if Plaintiff returned to work after his leave.

472.    Plaintiff's doctor cleared Plaintiff to return to work in November 2020.

473.    Plaintiff could perform the essential duties of his job with the use of a cane.

474.    Defendant Rice, however, refused to accommodate Plaintiff's cane.

41

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

475.   Because Defendant Rice refused to accommodate Plaintiff's cane, Plaintiff was forced to take additional leave until December 28, 2020.

476.   During this additional leave, Plaintiff received half pay.

477.   Plaintiff's surgeon released Plaintiff to return to work with no restrictions effective December 28, 2020.

478.   On or about December 17, 2020, Plaintiff hand delivered a copy of his medical release form to Defendant Rice.

479.   When Plaintiff delivered the medical release, Defendant Rice said "I would be crazy to let you return as Maintenance Manager."

480.   Defendant Rice also accused Plaintiff of having a "hero complex" and told Plaintiff that morale was high without him and that Plaintiff's return would "ruin" that.

481.   Plaintiff returned to work at 10:00 a.m. on December 28, 2020.

482.   Plaintiff met with Defendant Rice as instructed.

483.   During that meeting, Defendant Rice told Plaintiff that if it were up to him, Plaintiff would not allow him to return to his job.

484.   Defendant Rice told Plaintiff that he did not know what to do with him and wanted to put him on a 30-day probationary period.

485.   Defendant Rice also told Plaintiff that he had tried to report alleged issues with past jobs to Human Resources, but Human Resources informed him that his issues lacked sufficient documentation and were too far in the past.

486.   This discussion and probation were not backed up by written discipline.

487.   This discussion and probation did not comply with the employee handbook.

42

488.    Defendant Rice also told Plaintiff that there were engineers on campus performing assessments for energy projects and major maintenance planning.

489.    Defendant Rice told Plaintiff that he was not to speak to these engineers and if Plaintiff did, he would be sent home.

490.    Defendant Rice then instructed Plaintiff to spend the next few days cleaning up his office and work truck.

491.    Defendant Rice also informed Plaintiff that the rules regarding the use of Plaintiff's work truck had changed.

492.    Previously, Plaintiff had been allowed to dive the truck on campus during the day and then drive the truck the four blocks to Plaintiff's home.

493.    Defendant Rice told Plaintiff that he would no longer be allowed to drive the truck home and would need to walk to work tasks on campus.

494.    Defendant Rice also told Plaintiff that he would have a "hard time" explaining to the maintenance staff that they no longer reported to him.

495.    Based on Defendant Rice's comments, Plaintiff believed that Defendants intended to make Plaintiff's work life so unbearable that he would quit.

496.    On or about December 29, 2020, Defendant Rice told Plaintiff that Plaintiff would be in charge of the plumbing and electrical staff.

497.    That same day, Plaintiff overheard a loud conference call between Defendant Rice, Defendant Montgomery, and Compass Group Human Resources outlining ways to prevent Plaintiff from resuming his work duties.

498.    There was no effort to make the call private.

43

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

499.    The call made Plaintiff very uncomfortable.

500.    Plaintiff again asked Defendant Rice about his work status.

501.    Defendant Rice told Plaintiff that he wanted to write Plaintiff up for work that had been in progress before his leave.

502.    Defendant Rice told Plaintiff that he was angry that Compass Group Human Resources would not let him do so.

503.    On or about January 4, 2020, Plaintiff met with Defendant Rice to discuss Defendant Rice's job expectations for Plaintiff.

504.    During this meeting, Defendant Rice told Plaintiff that Plaintiff did not do a good job managing his maintenance crew.

505.    Defendant Rice also told Plaintiff that he had "no confidence" in Plaintiff.

506.    Defendant Rice also told Plaintiff that he would fail.

507.    Defendant Rice then reversed his prior position and told Plaintiff that he was to manage all maintenance staff.

508.    Defendant Rice then stated that he had promised his supervisor and Simpson College that the number of work orders in the maintenance system would be down to 300 by February 1, 2021.

509.    Defendant Rice instructed Plaintiff to use a feature on the company maintenance application to assign priorities to all of the workers.

510.    On or about January 6, 2021, Defendant Rice called Plaintiff into his office and told Plaintiff that Michael Eagle from the Des Moines Metro Opera (DMMO) had called an specifically asked Plaintiff to attend a meeting that day with DMMO Simpson and Waldinger Mechanical.

511.    Defendant Rice told Plaintiff that Mr. Eagle wanted Plaintiff in the meeting because Plaintiff knew the ins and outs of the building.

512.    Defendant Rice started verbally attacking Plaintiff as a result of Mr. Eagle's comment.

513.    Defendant Rice then told Plaintiff not to attend the meeting.

514.    However, later that day Defendant Rice told Plaintiff that he should in fact attend the meeting at Blank Theater.

515.    Defendant Rice told Plaintiff that the meeting was at 12:30 p.m.

516.    Plaintiff was late to the meeting because Defendant Rice had given him the incorrect meeting time.

517.    Plaintiff later learned that the meeting was actually scheduled for noon and not 12:30 p.m.

518.    Plaintiff spent the weekend of January 7–9, 2021 closing out finalized work orders in the maintenance application.

519.    However, on or about January 11, 2021, Defendant Rice called Plaintiff into his office and told Plaintiff he was angry that Plaintiff closed out these orders.

520.    Plaintiff told Defendant Rice that he did so in connection with the instruction that he reduce the number of open orders in the system to 300 by February 1, 2021.

521.    Defendant Rice told Plaintiff that he was no allowed to close work orders on the system.

522.    All other managers were allowed to close work orders on the system.

523.    Additionally, it was past practice for managers to close work orders on the system.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

524.    Defendant Rice also told Plaintiff that Defendant Montgomery had signed off on as much overtime as was needed to reduce the number of work orders to 300.

525.    However, Defendant Rice informed Plaintiff that Plaintiff was not allowed to work overtime because it would eat into his bonus.

526.    After the January 11 discussion with Defendant Rice, Plaintiff no longer was allowed to close work orders.

527.    Defendant Rice, however, also would not close work orders himself for many days.

528.    As a result, the number of open work orders was artificially inflated.

529.    As a result, it appeared that Plaintiff's performance was poorer than it actually was.

530.    In the past, Defendant Rice had told Plaintiff that poor performance cases were the best way to have an employee fired.

531.    On or about January 19, 2021, Defendant Rice still was not closing any of the work orders than maintenance had completed.

532.    On or about January 14, 2021, Defendant Rice told Plaintiff to take Work Truck SC11 home with him that night because there was a blizzard forecast.

533.    Work Truck SC11 has a plow and a salter.

534.    Defendant Rice then reminded Plaintiff that he still would be responsible for all of his regular work in addition to plowing snow and salting campus parking lots.

535.    Defendant Rice then instructed Plaintiff to plow and salt for all snow events going forward with Work Truck SC11 As requested by the grounds manager Colton Metzger.

536.    On or about February 5, 2021, Defendant Rice called Plaintiff into his office.

E-FILED 2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

537.    When Plaintiff arrived at Defendant Rice's office he was on the phone with a Compass employee named William.

538.    Defendant Rice then handed Plaintiff documents that stated "Final Progressive Counseling."

539.    Plaintiff had never received first or second level disciplinary documents.

540.    Defendant Rice then proceed to go through Plaintiff's alleged performance issues while William was on the phone.

541.    A large portion of the write-up concerned the number of open work orders.

542.    Plaintiff asked Defendant Rice what he could do to improve.

543.    Defendant Rice told Plaintiff that he'd had a plan to reduce the work numbers but that Plaintiff's return from leave ruined that plan.

544.    As Plaintiff left the meeting, Defendant Rice went into an area with other managers and started whooping and laughing.

545.    On or about February 10, 2021, Defendant Rice still had not closed out Plaintiff's finalized work orders.

546.    Other managers expressed their concern to Plaintiff.

547.    Plaintiff asked Defendant Rice if they would meet regarding the finalized work orders, but Defendant Rice said no.

548.    Meanwhile, on Sunday, February 7, 2021, Plaintiff contacted Colton Metzger to see if he needed Plaintiff to come to work that morning to help plow and salt the campus parking lots.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

549.    In doing so, Plaintiff was following the chain of command approval that Defendant Rice required.

550.    Mr. Metzer responded that Plaintiff's help would be appreciated and that the Grounds Crew was starting at 5 a.m.

551.    Plaintiff reported to campus and began plowing the parking lot near Wallace Hall.

552.    There were a lot of cars in the parking lot because of the Indianola Snow Ordinance.

553.    As a result of the Snow Ordinance, a lot of students who normally park on the street had moved their cars into the lot.

554.    While Plaintiff was plowing the East Lane of the Wallace Lot, he was backing his truck up to make another pass forward.

555.    Plaintiff did not see any vehicles behind him in his mirrors.

556.    However, while Plaintiff was backing up, he heard a crunching noise.

557.    Plaintiff pulled forward and exited the truck.

558.    Plaintiff saw that he had backed into a car that was sticking farther out into the traffic lane than those around it.

559.    Plaintiff immediately inspected the car and the work truck and found minor damage to the car's rear tail light and rear bumper.

560.    Plaintiff did not see any damage to the work truck (Work Truck SC11).

561.    Plaintiff called his supervisor, Defendant Rice, immediately.

562.    Defendant Rice told Plaintiff that "accidents happen" and instructed Plaintiff to take photographs of the car damage.

563.    Plaintiff then filled out and made copies of the Drivers Report of Accident.

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

564.    Plaintiff left copies of the Drivers Report of Accident on the car's windshield.

565.    Plaintiff also called Simpson College Security with the parking pass and license plate number so the owner could be identified and notified.

566.    Plaintiff followed all company procedures for vehicle accidents.

567.    Because the damage to the vehicle was minor and no one was injured, the police were not called.

568.    Following the accident, Plaintiff continued plowing.

569.    On or about February 9, 2021, Plaintiff was cleared to plow snow.

570.    That same day, Defendant Rice and William for SCC Human Resources attended the pre-shift meeting with Plaintiff and his crew.

571.    Plaintiff did not know why they were present other than to monitor him.

572.    On or about February 11, 2021, Defendant Rice became very angry with Plaintiff regarding the repair of refrigerant leaks in the mainframe computer room.

573.    Defendant Rice told Plaintiff that the company performing the repairs cost too much money.

574.    Defendant Rice then pulled his stocking hat over his eyes, shook his head, and said Plaintiff was running the repair project badly.

575.    Plaintiff responded that the repairs being performed were in the best interest of the mainframe room integrity.

576.    Defendant Rice accused Plaintiff of suggesting that he did not understand the importance of the project.

49

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

577.    Defendant Rice then asked, "How do you want to have it done when we terminate you? Do you want to do it at the beginning or end of the day? Do you want someone in there?"

578.    Plaintiff was afraid for his job and asked if he was being fired.

579.    Defendant Rice said, "You don't have to worry that you are being fired. Not today. Not tomorrow."

580.    Defendant Rice's voice was so loud that it could be heard by all of the other managers and hourly workers waiting to clock into work.

581.    On or about February 12, 2021, Defendant Rice sent an email to Plaintiff with a meeting request for 2 p.m. on Monday February 15, 2021.

582.    The meeting was described as a "discussion."

583.    Plaintiff asked Defendant Rice if the meeting was about terminating his employment.

584.    Defendant Rice said, "No. It's just a discussion."

585.    On or about Sunday, February 14, 2021, Plaintiff was assigned to plow and salt the parking lots for four hours.

586.    On or about February 15, 2021, Plaintiff went to Defendant Rice's office.

587.    Defendant Rice then made a call to Defendant Bennie Montgomery, USA Regional Director of Operations for Defendants Compass Group/SCC.

588.    Defendant Rice then handed Plaintiff termination papers and told Plaintiff that Defendants Compass Group and SCC were terminating him as of midnight that day for willful destruction of company or client property during the minor car accident on February 7, 2021.

50

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

589.    Plaintiff told Defendants Rice and Montgomery that the damage had been an accident.

590.    Plaintiff also stated that he did not intentionally run into anything.

591.    Plaintiff also was confused because he had been assigned to continue plowing for eight days following the accident.

592.    In fact, Plaintiff had been assigned to plow for four hours just the day before his termination.

593.    Other employees had been involved in work-related vehicle accidents throughout the last year and a half and none of those employees had been terminated.

594.    Plaintiff then was told to sign the termination papers that Defendant Rice placed in front of him.

595.    Defendant Rice also told Plaintiff that it did not matter if Plaintiff signed the paperwork or not because the termination would still go through.

596.    Plaintiff also was informed that his family's health insurance would be cut off at midnight that night.

597.    Plaintiff then was told to gather his personal items and to turn in his phone ank keys.

598.    Plaintiff then left the property.

599.    At the time of his termination, Plaintiff had been a maintenance employee at Simpson College for approximately 33 years.

600.    The Defendants' actions were both in violation of the Family and Medical Leave Act in interfering and in retaliation for the Plaintiff exercising his rights pursuant to FMLA.

51

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

601.    As a proximate case of Defendants' actions, Plaintiff has suffered general and special damages, including past and continuing lost wages and benefits.

602.    The actions of Defendants were willful and wonton, which warrant an award of punitive and/or liquidated damages.

**WHEREFORE**, the Plaintiff, Gary Ray Dooley, respectfully prays for judgment against Defendants Compass Group USA, Inc., Southeast Service Corporation, Randy Rice, and Bennie Montgomery in a sum deemed reasonable and proper for compensatory damages, for cost and interest and such other or further relief as just and proper.

Respectfully Submitted,

By:     /s/ *Bruce H. Stoltze, Jr.*_____
        Bruce H. Stoltze, Jr. (AT0010694)
        Stoltze Law Group, P.L.C.
        300 Walnut, Suite 260
        Des Moines, Iowa 50309
        Telephone:  (515) 989-8529
        Facsimile:   (515) 989-8530
        E-mail: bruce.stoltze.jr@stoltze.law
        ATTORNEY FOR PLAINTIFF

E-FILED  2022 OCT 27 12:01 PM WARREN - CLERK OF DISTRICT COURT

## JURY DEMAND

COMES NOW the Plaintiff, Gary Ray Dooley, and hereby demands a trial by jury of all

issues properly triable to a jury.

Respectfully Submitted,

By:     /s/ *Bruce H. Stoltze, Jr.*_____
Bruce H. Stoltze, Jr. (AT0010694)
Stoltze Law Group, P.L.C.
300 Walnut, Suite 260
Des Moines, Iowa 50309
Telephone:  (515) 989-8529
Facsimile:   (515) 989-8530
E-mail: bruce.stoltze.jr@stoltze.law
ATTORNEY FOR PLAINTIFF

**ORIGINAL FILED VIA CM/ECF.**

E-FILED  2023 JAN 20 9:03 AM WARREN - CLERK OF DISTRICT COURT

# AFFIDAVIT OF SERVICE

STATE OF IOWA )
                 )
COUNTY OF POLK )

Case No: _LACV039493_
Date Received: _1/19/23_

I, being first duly sworn, depose and say that I received and served:

| | |
|---|---|
| __X__ Original Notice | _____ Application for Hearing of |
| __X__ Petition |          Temporary Issues |
| __X__ Jury Demand | _____ Summons |
| _____ Subpoena Duces Tecum | _____ Complaint |
| _____ Petition for Dissolution of Marriage | _____ Notice to Quit |
| _____ Notice of Termination of tenancy | _____ Notice of Nonpayment |
| _____ Order: Pretrial Conf / Discovery |          of Rent and Intention to |
| _____ Subpoena |          Terminate Rental |
| _____ Family Law Case Requirements Order |          Agreement |
| _____ Notice of Termination of Tenancy | _____ Appearance and Answer |
| _____ Confidential Information Form | _____ Notice Non-judicial |
| _____ Verification of Account |          Foreclosure |
| _____ Order Re: Mediation of Temporary Matters | _____ Notice to Quit |
|          and Setting Hearing | _____ Exhibit _____ |
| _____ Notice of Forfeiture of Real Estate Contract | _____ Other _____ |
| _____ Order |          _____ |
| _____ Application for Rule to Show Cause |          _____ |
| _____ Rule to Show Cause / Order for Hearing | _____ Attachments |

Person Served: _Southeast Service Corporation_

Date Served: _1-20-23_ / _9:00_ (A.M.)/ P.M.

_505 - 5th Ave #729  DSM, IA_
(Address)

Manner of Service
_____ Personally
_____ Dwelling House, to person residing therein who was over the age of 18.
_____ Apartment Building
_____ Spouse, who lives at the dwelling house.
__X__ Corporation/State Official

_Corporation Service Company - Reg Agent_
NAME AND TITLE OR RELATIONSHIP OF INDIVIDUAL SERVED

Subscribed and sworn to me by Wendy Young
this _____ day of _____, 2023.

_____
Notary Public for the State of Iowa

Service Fee: _$_

ALI NEY
Commission Number 813598
My Commission Expires
November 5, 2024

E-FILED  2023 JAN 20 9:03 AM WARREN - CLERK OF DISTRICT COURT

## AFFIDAVIT OF SERVICE

STATE OF IOWA )
               )        Case No: _LACV039493_
COUNTY OF POLK )    Date Received: _1/19/23_

I, being first duly sworn, depose and say that I received and served:

| | |
|---|---|
| X Original Notice | _____ Application for Hearing of |
| X Petition | Temporary Issues |
| X Jury Demand | _____ Summons |
| _____ Subpoena Duces Tecum | _____ Complaint |
| _____ Petition for Dissolution of Marriage | _____ Notice to Quit |
| _____ Notice of Termination of tenancy | _____ Notice of Nonpayment |
| _____ Order: Pretrial Conf / Discovery | of Rent and Intention to |
| _____ Subpoena | Terminate Rental |
| _____ Family Law Case Requirements Order | Agreement |
| _____ Notice of Termination of Tenancy | _____ Appearance and Answer |
| _____ Confidential Information Form | _____ Notice Non-judicial |
| _____ Verification of Account | Foreclosure |
| _____ Order Re: Mediation of Temporary Matters | _____ Notice to Quit |
| and Setting Hearing | _____ Exhibit _____ |
| _____ Notice of Forfeiture of Real Estate Contract | _____ Other _____ |
| _____ Order | _____ |
| _____ Application for Rule to Show Cause | _____ |
| _____ Rule to Show Cause / Order for Hearing | _____ Attachments |

Person Served: _Compass Group USA Inc_

Date Served: _1-20-23_ / _9:00_ (A.M.)/ P.M.

_505 - 5th Ave #729    DSM. IA_
(Address)

Manner of Service
_____ Personally
_____ Dwelling House, to person residing therein who was over the age of 18.
_____ Apartment Building
_____ Spouse, who lives at the dwelling house.
__X__ Corporation/State Official

_C/o Corporation Service Co. - as Agent_
NAME AND TITLE OR RELATIONSHIP OF INDIVIDUAL SERVED

_Wendy Young_
Subscribed and sworn to me by Wendy Young
this _20_ day of _June_, 2023.

Service Fee: _75_

_Ali Ney_
Notary Public for the State of Iowa

ALI NEY
Commission Number 813598
My Commission Expires
November 5, 2024